1  Ruth Rizkalla, Esq., State Bar No. 224973
2    rrizkalla@carlsonattorneys.com
3  THE CARLSON LAW FIRM, PC
4  1230 Rosecrans Avenue, Suite 500
5  Manhattan Beach, CA 90266
6  Tel:   (254) 526-5688
7  Fax:   (254) 526-8204
8
9  Aaron K. Dickey, IL State Bar No. 6281731
10   aaron@dickeyanderson.com
11  DICKEY ANDERSON LAW FIRM, LLC
12  1104 Moorlands Drive, 2nd Floor
13  St. Louis, MO 63117
14  Tel: (314) 810-7668
15
16  *Attorneys for Plaintiff Jamie Lauren Horn*
17

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE LAUREN HORN,<br><br>              Plaintiff,<br><br>      vs.<br><br>ICU MEDICAL, INC., successor in interest by merger to SMITHS MEDICAL ASD, INC.,<br><br>              Defendant. | Case No.: 8:25-cv-02159-JVS-DFM<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

21

22      COMES NOW the Plaintiff, Jamie Lauren Horn, (hereinafter "Plaintiff"), by

23  and through her undersigned counsel, and brings this First Amended Complaint

24  against ICU Medical, Inc., successor in interest by merger to SMITHS MEDICAL

25  ASD, INC. ("Defendant"), and alleges as follows:

26      1.    This is an action for damages arising out of failures relating to

1  Defendant's design, development, testing, assembling, manufacturing, packaging,

2  promoting, marketing, distribution, supplying, and/or selling the defective

3  implantable vascular access device sold under the trade name of Port-A-Cath II

4  Power P.A.C. (hereinafter "Power P.A.C." or "Defective Device").

5  **PARTIES**

6      2.    At all times material, Plaintiff, Jamie Horn is an adult resident and

7  citizen of Sussex County, Delaware, and claims damages as set forth below.

8      3.    Defendant ICU Medical, Inc. ("ICU Medical") is a Delaware

9  corporation with its principal place of business located in San Clemente, California.

10 ICU Medical is engaged in the business of researching, developing, designing,

11 licensing, manufacturing, distributing, supplying, selling, marketing, and

12 introducing into interstate commerce, either directly or indirectly through third

13 parties or related entities, its medical devices, including the Power P.A.C.

14     4.    Defendant ICU Medical, Inc. ("ICU Medical") is a Delaware

15 corporation that, based upon public filings made by Defendant, merged with and

16 became a legal successor in interest to Smiths Medical ASD, Inc. ("Smiths

17 Medical") on July 24, 2024. The merger occurred after the implantation and removal

18 of the defective port that is the subject of Plaintiff's claim. Smiths Medical

19 conducted business throughout the United States, including the State of California,

20 and is a wholly owned subsidiary of ICU Medical. Smiths Medical is engaged in the

1    business of researching, developing, designing, licensing, manufacturing,

2    distributing, supplying, selling, marketing, and introducing into interstate

3    commerce, either directly or indirectly through third parties or related entities, its

4    medical devices, including the Power P.A.C.

5      5. Upon representation by the Defendant, Smiths Medical's assets and

6    liabilities were merged into the new ICU Medical entity, which occurred after

7    Plaintiff's implant and explanation, and would be successors in interest (and

8    liability).

9    **JURISDICTION AND VENUE**

10      6. This Court has subject matter jurisdiction over the parties pursuant to

11    28 U.S.C. §1332(a) because the parties are citizens of different states and the amount

12    in controversy exceeds $75,000.00, exclusive of interest and cost.

13      7. Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of

14    the facts that (a) a substantial part of the events or omissions giving rise to the claims

15    occurred in this District and (b) Defendant's products are produced, sold to, and

16    consumed by individuals in the State of California, thereby subjecting Defendant to

17    personal jurisdiction in this action and making them all "residents" of this judicial

18    District.

19      8. Defendant has and continues to conduct substantial business in the State

20    of California and in this District, distribute vascular access products in this District,

1   receive substantial compensation and profits from sales of vascular access products

2   in this District, and made material omissions and misrepresentations and breaches

3   of warranties in this District, so as to subject them to *in personam* jurisdiction in this

4   District.

5       9.      Consistent with the Due Process Clause of the Fifth and Fourteenth

6   Amendments, this Court has *in personam* jurisdiction over Defendant because

7   Defendant is present in the State of California, such that requiring an appearance

8   does not offend traditional notices of fair and substantial justice.

9                       **PRODUCT BACKGROUND**

10      10.     Defendant's Vascular Access Devices were designed, patented,

11  manufactured, labeled, marketed, sold, and distributed by the Defendant at all

12  relevant times herein.

13      11.     The Power P.A.C. is one of several varieties of implanted port catheters

14  (IPCs) that has been designed, manufactured, marketed, and sold by Defendant.

15      12.     According to Defendant, the Power P.A.C. is a totally implantable

16  vascular access device designed to provide repeated access to the vascular system

17  for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and

18  blood products.

13.    The intended purpose of the Power P.A.C. is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

14.    The Power P.A.C. is a system consisting of two primary components: an injection port and catheter which includes additives intended to make it radiopaque.

15.    The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

16.    The Power P.A.C. is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

17.    The product's catheter is comprised of a polymer and a barium sulfate radiopacity agent.

18.    Barium sulfate is known to contribute to reduction of the mechanical integrity of polymers *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane.

19.     The mechanical integrity of a barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

20.     Upon information and belief, Defendant's manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

21.     This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissure, pits and cracks as well as sections of the catheter lumen which contain more than 30% barium sulfate by weight, reducing the catheter strength at those loci.

22.     The roughened catheter surface leads to the collection and proliferation of fibrinous blood products, thereby drastically increasing the risk of biofilm, infection, thrombosis, sepsis and fracture.

23.     Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within polyurethane), Defendant elected not to incorporate those design elements into the Power P.A.C.

1        24.    Among the most common and concerning complications associated

2    with IPCs, such as the Power P.A.C. system, are IPC-related infections.

3        25.    There are several types of IPC-related infections. The most common

4    and severe are CRBSIs, or CLABSIs, which occur when microorganisms, typically

5    bacteria or fungi, colonize the surface of the catheter and enter the bloodstream.[1]

6        26.    IPC pocket infections refer to an infection localized in the subcutaneous

7    pocket where the port is implanted. These types of infections most often occur within

8    a few days of implantation.[2] If clinical signs appear in the IPC pocket after that time-

9    frame, then it is most commonly related to a CRBSI.[3]

10        27.    The least common IPC-related infections are tunnel infections which

11    occur when an infection occurs along the subcutaneous tunnel created for the

12    placement of the central venous catheter.[4]

13        28.    IPC-related infections occur through a multi-step process that begins

14    with device conditioning followed by microbial contamination, microbial adherence

15    and biofilm formation, and ultimately progresses to localized infection and/or

---

[1] Teichgräber, UKM., Gebauer, B., Saleh, A. Outcome analysis in 3,160 implantations of radiologically guided placements of totally implantable central venous port systems. European Radiology. 2011;21(6):1224–1232.

[2] Machat, S., et al. Complications of central venous port systems: a pictorial review. Insights into imaging. 2019; 10(1):86; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

[3] Baang JH, Inagaki K, Nagel J, et al. Inpatient Diagnosis and Treatment of Catheter-Related Bloodstream Infection [Internet]. Ann Arbor (MI): Michigan Medicine University of Michigan; 2023 Jan.

[4] Machat, S., et al. Complications of central venous port systems: a pictorial review. Insights into imaging. 2019; 10(1):86; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

bloodstream infection. Biofilm formation on IPCs is particularly problematic because of the frequent use and long-term placement of these devices. Microbial contamination, colonization, and biofilm formation on catheter surfaces can begin as early as 24 hrs. after insertion.[5]

29.    Vascular access device (VAD), like Defendant's IPC, infections are closely linked to the development of biofilms on the surface of the foreign body.[6] Approximately 60% of hospital acquired infections (HAIs) worldwide are believed to be caused by micro-organisms forming biofilms on medical devices.[7]

30.    Once the biofilm is established, it serves as a reservoir for persistent infection. Biofilms are notoriously difficult to eradicate due to their resistance to both the host's immune system and antimicrobial therapy.[8] In most instances, antimicrobial therapy is not sufficient to treat these infections, as antimicrobials will not remove/eliminate the biofilms and their embedded micro-organisms and thus device removal is required.[9]

31.    Although not an absolute requirement for microbial adhesion, the initial

---

[5] Donlan, R. M. Biofilms and device-associated infections. Emerging infectious diseases. Centers for Disease Control and Prevention, 2002:7(2), p. 277; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

[6] Bustos, M. D., et al. Long-term Catheterization: current approaches in the diagnosis and treatment of port-related infections. Infection and Drug Resistance 2014:7 25-35.

[7] Treter, J., Macedo, a J. Catheters: a suitable surface for biofilm formation. Science against microbial pathogens: communicating current research and technological advances; Formatex 2011:835–842.

[8] Gominet et al. (2017); Bustos et al. (2014)

[9] Kojic, EM and Darouiche, RO. Candida Infections of Medical Devices. Clin. Microbiol. Rev. 2004; 17 (2):255-267.; Mack, D., et al. Biofilm formation in medical device-related infection. Int. J. Artif. Organs. 2006; 29 (4):343-59.

1    adhesion of proteins to the surface of a foreign body (also called conditioning) and

2    thrombosis promotes biofilm formation. Immediately after insertion, a conditioning

3    film composed of organic macromolecules from body fluids, such as fibrinogen,

4    fibronectin, vitronectin, thrombospondin, glucose, and pyruvate, coats the catheter

5    surface.[10] This is a natural response to a foreign body; however, this film

6    unfortunately provides an ideal environment for microbial attachment.[11]

7          32.    This protein adhesion facilitates microbial adhesion in multiple ways.

8    Protein adhesion creates more surface area for bacteria adhesion.[12] Protein adhesion

9    allows bacteria to adhere to more diverse surfaces.[13] Proteins within the thrombus

10    can attract microbial species.[14] Protein adhesion increases the risk of both biofilm

11    formation and thrombosis, which are closely interconnected and create a reinforcing

12    cycle.[15]

[10] Fletcher, S. Catheter-related bloodstream infection, Continuing Education in Anaesthesia Critical Care & Pain, 2005;5(2), pp. 49–51; Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017).

[11] Gominet, M., et al. Central Venous Catheters & Biofilms: Where Do We Stand in 2017? APMS 125:365-375 (2017); Nycz, A., et al. Surface Analysis of Long-Term Hemodialysis Catheters Made of Carbothane (Poly(carbonate)urethane) Before and After Implantation in Patients' Bodies. Act of Bioengineering & BioMechanics. 2018; 20(2).

[12] Palmer, J, Flint, S and Brooks, J. Bacterial cell attachment, the beginning of a biofilm. Journal of Industrial Microbiology and Biotechnology. 2007; 34(9):577–588.

[13] Li, Q., et al. Zwitterionic Biomaterials. Chemical Reviews. 2022; 122(23):17073–17154.

[14] Mohammad, SF. Enhanced risk of infection with device-associated thrombi. ASAIO journal. 2000; 46(6):S63–S68; Mehall, JR., et al. Fibrin sheath enhances central venous catheter infection. Critical care medicine. 2002; 30(4):908–912; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067.

[15] Galloway, S. et al., Long-term central venous access, 92 British Journal of Anaesthesia 722 (2004); Fletcher, S. Catheter-related bloodstream infection, Continuing Education in Anaesthesia Critical Care & Pain, 2005;5(2), pp. 49–51; van Rooden, CJ., Schippers, EF., et al. Infectious complications of central venous catheters increase the risk of catheter-related thrombosis in hematology patients: a prospective study. Journal of Clinical Oncology. American Society of

33.    Preventing microbial adhesion and biofilm formation leads to a significant drop in infection rates.

34.    IPC materials permit rather than inhibit microbial adhesion and biofilm formation.

    a.    Surface roughness promotes biofilm formation and increases the risk of infection.

    b.    Barium Sulfate ($BaSO_4$) diffusion increases surface roughness which promotes biofilm formation and increases the risk of infection.

    c.    Biodegradation increases surface roughness which promotes biofilm formation and increases the risk of infection.

    d.    Port Body material and structure can influence microbial adhesion and biofilm formation.

35.    Technologies exist that prevent biofilm formation and/or reduce thrombus accumulation which also reduces the risk of biofilm formation.

    a.    Antimicrobial catheters prevent and/or reduce the risk of CRBSI by preventing or reducing bacterial colonization and biofilm formation on

Clinical Oncology; 2005;23(12):2655–2660; Smith, RS., Zhang, Z., Bouchard, M., et al. Vascular catheters with a nonleaching poly-sulfobetaine surface modification reduce thrombus formation and microbial attachment. Science Translational Medicine. 2012;4(153); Busch JD, Vens M, Mahler C, Herrmann J, Adam G, Ittrich H. Complication Rates Observed in Silicone and Polyurethane Catheters of Totally Implanted Central Venous Access Devices Implanted in the Upper Arm. J Vasc Interv Radiol. 2017 Aug;28(8):1177-1183; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067.

1    catheter surfaces through traditional bactericidal (lethal) or bacteriostatic

2    (inhibitory) mechanisms.[16]

3         b.    Catheters with non-fouling coatings and substrates reduce risk of

4    CRBSI by inhibiting its triggers—protein adsorption, bacterial adhesion, and

5    biofilm formation on catheter surfaces.[17]

6         c.    Catheters that incorporate both non-fouling coatings or additives

7    (preventing protein adsorption and bacterial adhesion) *and* antimicrobial

8    agents (killing bacteria) reduce the risk of CRBSI.[18]

9        36.    Defendant's IPCs design, such as the Power P.A.C., increase the risk of

10    infection.

11         a.    Defendant's IPCs have rough and variable surfaces.

12         b.    Defendant's uncoated IPCs permit rather than inhibit microbial

---

[16] Zander, Becker. Antimicrobial and Antifouling Strategies for Polymeric Medical Devices. ACS Macro Letters. 2018;7(1):16-25; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067; Monzillo, V., et al. Chlorhexidine-silver sulfadiazine–impregnated central venous catheters: In vitro antibacterial activity and impact on bacterial adhesion. New Microbiologica. 2012; 35(2):175–182; Xu, LC., Siedlecki, CA. Antibacterial Polyurethanes. Advances in Polyurethane Biomaterials, 2016.

[17] Li, Q., et al. Zwitterionic Biomaterials. Chemical Reviews. 2022; 122(23):17073–17154; Zhang, Z., et al. Blood compatibility of surfaces with superlow protein adsorption. Biomaterials. 2008;29(32):4285–4291.

[18] Zander, Becker. Antimicrobial and Antifouling Strategies for Polymeric Medical Devices. ACS Macro Letters. 2018;7(1):16-25; Li, Q., et al. Zwitterionic Biomaterials. Chemical Reviews. 2022; 122(23):17073–17154; Neoh, KG., et al. Surface modification strategies for combating catheter-related complications: recent advances and challenges. Journal of Materials Chemistry B. 2017; 5(11):2045–2067; Singha, P., Locklin, J., Handa, H. Multipronged Approach to Combat Catheter-Associated Infections and Thrombosis by Combining Nitric Oxide and a Polyzwitterion: A 7-Day In Vivo Study In a Rabbit Model. ACS Appl. Mater. Interfaces 2020;12:907-9079.

adhesion, thus increasing the risk of infection.

c.      Defendant's uncoated IPCs permit rather than inhibit thrombus accumulation which increases risk of infection.

d.      Defendant's IPCs are impregnated with barium sulfate which increases the risk of CRBSI.

e.      Defendant's IPCs are prone to degradation which increases the risk of biofilm formation.

f.      Defendant's uncoated IPCs port bodies permit rather than inhibit biofilm formation and thrombus accumulation which increases risk of infection.

g.      Defendant failed to incorporate technologies that reduce the risk of infection even though numerous commercially available technologies exist.

37.    If Defendant had incorporated safer alternative designs, then the incidence of IPC-related infections would have been reduced.

a.      If Defendant had incorporated antimicrobial/antiseptic technology, then the incidence of IPC-related infections would have been reduced.

b.      If Defendant had incorporated antifouling technology, then the incidence of IPC-related infections would have been reduced.

c.      If the Defendant had incorporated technologies that reduce

surface roughness, then the incidence of IPC-related infections would have been reduced.

d.    If the Defendant had incorporated other technologies, such as combined non-fouling and antimicrobial surface modifications, enzyme treatment or heparin then the incidence of IPC-related infections would have been reduced.

38.    At all times relevant, Defendant misrepresented the safety of the Power P.A.C. system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the Power P.A.C. system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

39.    At all times relevant to this action, Defendant knew and had reason to know, that the Power P.A.C. was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to infection, thrombosis, fracturing, perforating internal vasculature, and otherwise malfunctioning.

40.    At all times relevant to this action, Defendant knew and had reason to know that patients implanted with a Power P.A.C. port had an increased risk of suffering life threatening injuries, including but not limited to: death; fracture;

sepsis; thrombosis; thromboembolic events; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

41.    Shortly after entering the market, Defendant began receiving numerous adverse event reports indicating that the Power P.A.C. could experience housing-reservoir separations. Based on these events, Defendant issued a Class I recall in early 2025 and advised providers to monitor for device defects. While specific reports of fractured fragments migrating to internal organs or vasculature perforation have been alleged in patient litigation, these serious complications have not been substantively described in public recall documentation. Any such occurrences would likely stem from the core defect of port separation.

42.    Smiths Medical, in issuing the FDA Class I recall, confirmed that Power P.A.C. housing-reservoir separations 'may cause serious adverse health consequences' — including **therapy disruption, tissue or skin damage, air embolism, and even death** in the most serious cases. The recall notification also recommended clinical monitoring for signs of device failure. While additional patient-level harms have been alleged in litigation, the recall itself does not document cardiac tamponade, vessel or organ perforations, hemorrhage, or

1  arrhythmias as verified outcomes.

2      43.    Defendant was aware or should have been aware that the Power P.A.C.

3  had a substantially higher failure rate than other similar products on the market, yet

4  Defendant failed to warn consumers of this fact.

5      44.    Defendant also intentionally concealed the severity of complications

6  caused by the Power P.A.C. and the likelihood of these events occurring.

7      45.    Rather than alter the design of the Power P.A.C. to make it safer or

8  adequately warn physicians of the dangers associated with the Power P.A.C.,

9  Defendant continued to actively and aggressively market the Power P.A.C. as safe,

10  despite their knowledge of numerous reports of catheter fracture and associated

11  injuries.

12      46.    Moreover, Defendant concealed—and continue to conceal—their

13  knowledge of the Power P.A.C.'s dangerous propensity to precipitate infection.

14  Defendant further concealed their knowledge that the catheter design caused these

15  failures and that these failures cause serious injuries.

16      47.    The conduct of Defendant, as alleged in this Complaint, constitutes

17  willful, wanton, gross, and outrageous corporate conduct that demonstrates a

18  conscious disregard for the safety of Plaintiff. Defendant had actual knowledge of

19  the dangers presented by the Power P.A.C. System, yet consciously failed to act

20  reasonably to:

1            a.     Adequately inform or warn Plaintiff, her prescribing physicians,

2     or the public at large of these dangers;

3            b.     Establish and maintain an adequate quality and post-market

4     surveillance system; or

5            c.     Recall the Power P.A.C. System from the market.

6     **SPECIFIC FACTUAL ALLEGATIONS AS TO JAMIE HORN**

7     48.     On or about November 7, 2021, Plaintiff underwent placement of the

8 Port-A-Cath II Power P.A.C., catalog number 21-4483-24, lot number 4163578. The

9 device was implanted by Dr. James Spellman, M.D., at Beebe Surgical Oncology,

10 in Lewes, Delaware, for the purpose of ongoing treatment for administering

11 chemotherapy.

12     49.     Defendant, directly or through their agents, apparent agents, servants,

13 or employees designed, manufactured, marketed, advertised, distributed and sold the

14 Power P.A.C. that was implanted in Plaintiff.

15     50.     Defendant manufactured, sold, and/or distributed the Power P.A.C. to

16 Plaintiff, through her doctors, to be used for administering chemotherapy as

17 treatment for breast cancer.

18     51.     On or about September 25, 2023, Plaintiff developed a blood clot

19 along with severe pain and persistent pain around the Power P.A.C. Plaintiff was

20 treated for the blood clot with blood thinners.

52.    On or about September 27, 2023, Plaintiff's defective port was removed by Dr. James Spellman, M.D., at Beebe Surgical Oncology, in Lewes, Delaware.

53.    At all times, the Power P.A.C. was utilized and implanted in a manner foreseeable to Defendant, as Defendant generated the instructions for use and created procedures for implanting the product.

54.    The Power P.A.C. implanted in Plaintiff was in the same or substantially similar condition as when it left the possession of Defendant and in the condition directed by and expected by Defendant.

55.    Plaintiff and her physicians foreseeably used and implanted the Power P.A.C. and did not misuse or alter the Power P.A.C. in an unforeseeable manner.

56.    Defendant advertised, promoted, marketed, sold, and distributed the Power P.A.C. as a safe medical device when Defendant knew or should have known the Power P.A.C. was not safe for its intended purposes and that the product could cause serious medical problems.

57.    Defendant had sole access to material facts concerning the defective nature of the Power P.A.C. product and its propensity to cause serious and dangerous side effects.

58.    In reliance on Defendant's representations, Plaintiff's doctor was induced to and did use the Power P.A.C.

59.    As a result of having the Power P.A.C. implanted, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, and has suffered financial or economic loss, including, but to limited to, obligations for medical services and expenses, and present and future lost wages.

60.    Defendant's Power P.A.C. was marketed to the medical community and to patients as a safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

61.    The Defendant has marketed and sold the Defendant's Power P.A.C. to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

62.    The injuries, conditions, and complications suffered due to Defendant's Power P.A.C. include but are not limited to infection; necrosis; fracture and leakage; blood clots; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms

similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

63.    Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with her medical providers, Plaintiff did not discover, and could not reasonably have discovered through the exercise of due diligence, the nature of her injuries and their causal relationship to the Product until a date within the applicable statute of limitations.   Accordingly, under the discovery rule, Plaintiff's claims were timely filed.

64.    Plaintiff did not become aware of Defendant's wrongful conduct, including but not limited to the defective design and/or manufacturing of the Product, until a time within the applicable statute of limitations.   Even with the exercise of reasonable diligence, Plaintiff could not have discovered this conduct earlier.   Therefore, application of the discovery rule confirms that this action was filed within the statutory limitations period.

65.    Defendant was negligent toward Plaintiff in the following respects:

a.    Defendant failed to incorporate safer alternative designs in the Power P.A.C. that would have prevented IPC-related blood clots.

b.    Defendant failed to design and establish a safe, effective procedure for removal of Power P.A.C.; therefore, in the event of a failure, injury, or complications it is difficult to safely remove Power P.A.C.

c.      Defendant provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using Power P.A.C. for the purpose of increasing their sales.  By so doing, Defendant caused the dissemination of inadequate and misleading information to patients, including the Plaintiff.

66.    At the time of her operation, Plaintiff was not informed of, and had no knowledge of the complaints, known complications, and risks associated with Power P.A.C., including but not limited to the extent of seriousness of the danger of blood clots, fracture and infection.

67.    Plaintiff was never informed by Defendant of the defective and dangerous nature of Power P.A.C.

68.    At the time of her implant, neither Plaintiff nor Plaintiff's physicians were aware of the defective and dangerous condition of Power P.A.C.

69.    As a result of the Defendant's actions and inactions, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
(Against Defendant ICU Medical)

70.    Plaintiff incorporates paragraphs 1 through 69 as if set out fully herein.

71. The Defendant owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling, and conducting post-market surveillance of the Power P.A.C.

72. The Defendant failed to exercise due care under the circumstances and therefore breached this duty by:

a. Failing to properly and thoroughly test the Power P.A.C. before releasing the device to market, and/or failing to implement feasible safety improvements;

b. Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the Power P.A.C.;

c. Failing to conduct sufficient post-market testing and surveillance of the Power P.A.C.;

d. Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the Power P.A.C.;

e. Designing, manufacturing, marketing, advertising, distributing, and selling the Power P.A.C. to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the Power P.A.C. and without proper instruction to avoid the harm which could foreseeably

1    occur as a result of using the device;

2        f.    Failing to exercise due care when advertising and promoting the

3    Power P.A.C.; and

4        g.    Negligently continuing to manufacture, market, advertise, and

5    distribute the Power P.A.C. after Defendant knew or should have known of

6    its adverse effects.

7    73.    As a direct, actual, and proximate cause of the Defendant's actions,

8    omissions, and misrepresentations, Plaintiff has been injured and has sustained

9    economic and non-economic damages, both in the past and future, including for pain

10    and suffering and medical expenses.

11    74.    In performing the foregoing acts, omissions, and misrepresentations,

12    Defendant acted grossly negligent, fraudulently, and with malice.

13    **SECOND CAUSE OF ACTION**
14    **STRICT PRODUCTS LIABILITY – FAILURE TO WARN**
15    (Against Defendant ICU Medical)
16
17    75.    Plaintiff incorporates paragraphs 1 through 69 as if set out fully herein.

18    76.    Defendant designed, set specifications, manufactured, assembled,

19    processed, marketed, labeled, distributed, and sold the Power P.A.C., including the

20    one implanted in Plaintiff, into the stream of commerce and in the course of the

21    same, directly advertised and marketed the device to consumers or persons

22    responsible for consumers, and therefore had a duty to warn of the risk of harm

1   associated with the use of the device and to provide adequate instructions on the safe

2   and proper use of the device.

3       77.     At the time Defendant designed, manufactured, prepared, compounded,

4   assembled, processed, marketed, labeled, distributed, and sold the device into the

5   stream of commerce, the device was defective and presented a substantial danger to

6   users of the product when put to its intended and reasonably anticipated use, namely

7   as an implanted port/catheter system to administer the medications. Defendant failed

8   to adequately warn of the device's known or reasonably scientifically knowable

9   dangerous propensities and further failed to adequately provide instructions on the

10  safe and proper use of the device.

11      78.     Defendant knew or should have known at the time they manufactured,

12  labeled, distributed and sold the Power P.A.C. that was implanted into Plaintiff that

13  the Power P.A.C. posed a significant and higher risk than other similar devices of

14  device failure and resulting serious injuries.

15      79.     Defendant failed to timely and reasonably warn of material facts

16  regarding the safety and efficacy of the Power P.A.C.; no reasonable health care

17  provider, including Plaintiff's, and no reasonable patient would have used the device

18  in the manner directed, had those facts been made known to the prescribing

19  healthcare providers or the consumers of the device.

20      80.     The warnings, labels, and instructions provided by the Defendant at all

times relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

81.    The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

82.    The Power P.A.C., which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendant, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

83.    When Plaintiff was implanted with the device, Defendant failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

84.    Defendant intentionally underreported the number and nature of adverse events associated with fracture and migration of the devices to Plaintiff's health care providers, as well as the FDA.

85.    Upon information and belief, neither Plaintiff nor her health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

86.    Plaintiff and her health care providers used the Power P.A.C. in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream.

87.    Upon information and belief, the defective and dangerous condition of the device, including the one implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendant to distributors and/or healthcare professionals or organizations.

88.    Upon information and belief, the device implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendant.

89.    Defendant's lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries, and economic damages in an amount to be determined at trial. Had Defendant provided adequate warnings, Plaintiff and her physicians would not have used the device.

90.    As a direct, actual, and proximate cause of the Defendant's actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

1    91.    In performing the foregoing acts, omissions, and misrepresentations,

2    Defendant acted grossly negligent, fraudulently, and with malice.

3                                **THIRD CAUSE OF ACTION**
4               **STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
5                              (Against Defendant ICU Medical)
6
7    92.    Plaintiff incorporates paragraphs 1 through 69 as if set out fully herein.

8    93.    Defendant supplied, manufactured, sold, distributed and/or otherwise

9    placed into the stream of commerce the Power P.A.C. implanted into Plaintiff.

10   94.    The Power P.A.C. implanted in the Plaintiff was not reasonably safe for

11   its intended use and was defective with respect to its design.

12   95.    The Power P.A.C. was in a defective condition and was defective in its

13   design in that when it left the possession and control of Defendant, it was not safe

14   for its anticipated use and safer, more reasonable alternative designs existed that

15   could have been utilized by Defendant.

16   96.    The Power P.A.C. was unreasonably dangerous to the user or

17   consumer, taking into consideration the utility of said product and the risks involved

18   in its use. The foreseeable risks associated with the design of the product were more

19   dangerous than a reasonably prudent consumer such as Plaintiff and/or her

20   physicians would expect when the product was used for its normal and intended

21   purpose.

22   97.    The Power P.A.C. was expected to and did reach the consumer without

1  substantial change in the condition in which it was supplied, distributed, sold and/or

2  otherwise placed into the stream of commerce.

3      98.    A reasonably prudent medical device manufacturer would have

4  recognized the defective design of the Power P.A.C. and not placed it into the stream

5  of commerce.

6      99.    The design defects in the Power P.A.C. were not known, knowable

7  and/or reasonably apparent to Plaintiff and/or her physician or discoverable upon

8  any reasonable examination.

9      100.    The Power P.A.C. was used and implanted in the manner in which it

10  was intended to be used and implanted by Defendant pursuant to the instructions for

11  use and the product specifications provided by Defendant.

12      101.    As a direct, actual, and proximate cause of the Defendant's actions,

13  omissions, and misrepresentations, Plaintiff has been injured and has sustained

14  economic and non-economic damages, both in the past and future, including for pain

15  and suffering and medical expenses.

16      102.    In performing the foregoing acts, omissions, and misrepresentations,

17  Defendant acted grossly negligent, fraudulently, and with malice.

18          **<u>FOURTH CAUSE OF ACTION</u>**
19          **<u>BREACH OF IMPLIED WARRANTY</u>**
20              (Against Defendant ICU Medical)
21
22      103.    Plaintiff incorporates paragraphs 1 through 69 as if set out fully herein.

104. Defendant impliedly warranted that the Power P.A.C. was merchantable and fit for the ordinary purposes for which it was intended.

105. When the Power P.A.C. was implanted in the Plaintiff, it was being used for the ordinary purposes for which it was intended.

106. The Plaintiff, individually and/or by and through her physician, relied upon Defendant's implied warranties of merchantability in consenting to have the Power P.A.C. implanted in her.

107. Privity exists between Plaintiff and Defendant because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

108. Plaintiff was the intended consumer of the device when Defendant made the warranties set forth herein, and such warranties were made to benefit Plaintiff as a patient and consumer.

109. Defendant breached these implied warranties of merchantability because the Power P.A.C. implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but were not limited to, variances in the following respects:

   a. Defendant's manufacturing process in constructing the catheter of the Power P.A.C. implanted in Plaintiff involved too high of a

concentration of barium sulfate particles for the polymer formulation, which led to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

b.    Defendant knew or should have known barium sulfate is known to contribute to a reduction in the mechanical integrity of the silicone in its product, the Power P.A.C., as the barium sulfate particles dissociate from the surface of the catheter over time; and

c.    These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the higher barium sulfate concentration that ultimately led to the collection and proliferation of blood products, thereby drastically increasing the risk of biofilm, thrombosis, infection, sepsis and fracture.

110.    Defendant's breaches of their implied warranties resulted in the implantation of an unreasonably dangerous and defective product, the Power P.A.C., into Plaintiff's body, placing said Plaintiff's health and safety in jeopardy.

111.    The Power P.A.C. was sold to the Plaintiff's health care providers for implantation in patients, such as Plaintiff.

112.    As a direct, actual, and proximate cause of the Defendant's actions, omissions, and misrepresentations, Plaintiff has been injured and has sustained

1  economic and non-economic damages, both in the past and future, including for pain

2  and suffering and medical expenses.

3       113.   Upon information and belief, Plaintiff's healthcare providers sent

4  notice to Defendant of the adverse event that occurred to Plaintiff and thus, the

5  nonconformity of the Power P.A.C., within a reasonable period of time following

6  discovery of the breach of warranty and before suit was filed.

7                    **FIFTH CAUSE OF ACTION**
8                    **BREACH OF EXPRESS WARRANTY**
9                    (Against Defendant ICU Medical)
10
11  (Cal. Com. Code § 2313; *Hauter v. Zogarts*, 534 P.2d 377 (Cal. 1975); 21 U.S.C. §
12  352; 21 C.F.R. § 801.6; *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984);
13  *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996))
14
15       114.   Plaintiff incorporates paragraphs 1 through 69 as if set out fully herein.

16       115.   On or before November 7, 2021, and prior to Plaintiff's implantation,

17  Defendant ICU Medical distributed and promoted written materials concerning its

18  Power P.A.C. implantable port-catheter system to hospitals, surgeons, and patients,

19  including Plaintiff and his implanting physician. These written materials included

20  Instructions for Use (IFUs), patient guides, product brochures, and marketing

21  literature. One such document was titled "Understanding Your Power P.A.C. Port

22  System", which expressly stated:

23              "The Power P.A.C. has been clinically tested and proven
24              safe for long-term intravenous therapy and is specifically
25              designed to reduce the risk of infection and thrombosis
26              compared to competing implantable ports."

1
2  This statement, among others, was presented as an unequivocal guarantee of the

3  product's safety, fitness for its intended use, and superiority over other available

4  port-catheter systems.

5      116.  These express warranties were made in writing and were provided to

6  Plaintiff's implanting physician, Dr. James Spellman at Beebe Medical Center in

7  Lewes, Delaware, and reviewed with Plaintiff before her procedure on November 7,

8  2021.  They were part of the basis of the bargain, as Plaintiff's physician and Plaintiff

9  relied on these explicit statements when selecting and consenting to implantation of

10  the Power P.A.C. device.  Without these written assurances, neither Plaintiff nor her

11  physician would have chosen the Power P.A.C. over other port systems.

12      117.  These express warranties included, but were not limited to:

13      a.  Written representations that the Power P.A.C. system had been

14  "clinically tested and proven safe for long-term intravenous therapy."

15      b.  Written assurances that the device's design was intended to

16  reduce fracture, infection and thrombosis, improving patient safety compared

17  to competitors.

18      c.  Statements in product literature that the device was regulated and

19  manufactured in compliance with applicable federal law, implying a superior

20  safety profile and reliability.

21      d.  Comparative claims that ICU Medical's Power P.A.C. "offers

1    superior protection against infection and complications compared to

2    competing implantable port systems."

3    118.   These written warranties were false and misleading at the time they

4    were made. In reality, the Power P.A.C. system had not been properly tested in its

5    final configuration, contained unvalidated design and material changes, and carried

6    a known but undisclosed risk of catheter surface defects, biofilm formation, serious

7    infections, sepsis, and device fracture. ICU Medical's written materials omitted

8    known adverse effects, including infection, stroke, and heart attack, thereby

9    rendering the product labeling and brochures misleading. As a result, Plaintiff and

10    his physician were deprived of accurate information and relied on false written

11    guarantees of safety and efficacy.

12    119.   Plaintiff alleges on information and belief that ICU Medical distributed

13    the above-described written materials, including product brochures, Instructions for

14    Use, and patient guides containing express warranty language, to hospitals,

15    surgeons, and patients throughout the United States, including the facility where

16    Plaintiff's procedure occurred, before November 7, 2021. Because these materials

17    are in Defendant's exclusive possession and control, Plaintiff cannot at this stage

18    provide copies of every specific document. Plaintiff will identify and attach the

19    precise warranty statements once ICU Medical produces these materials during

20    discovery. This allegation is based on industry custom and practice, the uniform

marketing and labeling requirements for Class III medical devices, and the promotional literature already identified by Defendant in related litigation and regulatory submissions.

120. These warranties were false. At the time of sale and implantation:

      a.    The device had not been tested in its final configuration;

      b.    Its design and component composition had been substantively altered through unvalidated PMA Supplements;

      c.    Its clinical safety for patients with autoimmune conditions had not been demonstrated; and

      d.    Known adverse effects, including infection, stroke and heart attack had been omitted from product disclosures.

121. The Power P.A.C. system did not conform to ICU Medical's express representations and was not of the quality or safety promised at the time of sale.

122. Plaintiff relied on these warranties in choosing to proceed with implantation, and her healthcare providers relied on ICU Medical's literature, IFUs, and representative support in recommending the device.

123. California law recognizes a cause of action for breach of express warranty under Cal. Com. Code § 2313. (*Hauter*, 534 P.2d at 382-83), where a seller's affirmations or descriptions form the basis of the bargain. California applies the same rule under Cal. Com. Code § 2313. (*Hauter*, 534 P.2d at 382-83).

124.    ICU Medical's breach of its express warranties was a substantial factor in causing Plaintiff's injuries. The device failed to perform as warranted, and Plaintiff suffered neurological symptoms, pain, and dysfunction as a direct result.

125.    As a result of the device failure, Plaintiff suffered internal injury, required revision surgery, and incurred substantial medical expenses.

126.    Plaintiff's device failed and fractured, contrary to Defendant's express assurances of safety and durability.

127.    Plaintiff's implanting physician and Plaintiff herself relied on these representations when selecting and implanting the device.

128.    This claim is not preempted. Express warranty liability arises from Defendant's own voluntary statements and representations and does not impose any additional or different federal requirements. (*Lohr*, 518 U.S. at 503; *Silkwood*, 464 U.S. at 256).

129.    The Defendant is in a superior position to identify and produce its own express warranties and representations.   Plaintiff intends to seek these materials during the discovery process.

130.    On information and belief, Defendant expressly warranted through its product labeling and promotional materials that the device was safe for subcutaneous use. These materials are in Defendant's possession and will be identified more precisely once discovery commences.

<strong><u>SIXTH CAUSE OF ACTION</u></strong><br>
<strong><u>FRAUDULENT CONCEALMENT</u></strong><br>
(Against Defendant ICU Medical)

131.   Plaintiff incorporates paragraphs 1 through 69 as if set out fully herein.

132.   Defendant made false statements and representations to Plaintiff and her healthcare providers concerning the Power P.A.C. product implanted in Plaintiff.

133.   Defendant engaged in and fraudulently concealed information with respect to the Power P.A.C. in the following respects:

a.   Defendant represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the Power P.A.C. was safe and fraudulently withheld and concealed information about the substantial risks of using the Power P.A.C., including but not limited to, its heightened propensity to precipitate infection, and cause complications;

b.   Defendant represented that the Power P.A.C. was safer than other alternative systems and fraudulently concealed information which demonstrated that the Power P.A.C. was not safer than alternatives available on the market;

c.   Defendant concealed that it knew these devices were fracturing and migrating from causes other than the manner in which the implanting physician implanted the device; and

1             d.      That frequency of these failures and the severity of injuries were

2       substantially worse than had been reported.

3      134.   Defendant had knowledge that the representations they made

4   concerning the Power P.A.C., as stated above, were false.

5      135.   Defendant had sole access to material facts concerning the dangers and

6   unreasonable risks of the Power P.A.C.

7      136.   The concealment of information by the Defendant about the risks of the

8   Power P.A.C. was intentional.

9      137.   The concealment of information and the misrepresentations about the

10   Power P.A.C. was made by the Defendant with the intent that Plaintiff's health care

11   providers and Plaintiff rely upon them.

12      138.   Plaintiff and her physicians relied upon the representations and were

13   unaware of the substantial risks of the Power P.A.C. which the Defendant concealed

14   from the public, including Plaintiff and her physicians.

15      139.   As a direct and proximate result of the Defendant's actions, omissions

16   and misrepresentations, Plaintiff has been injured and has sustained economic and

17   non-economic damages, both in the past and future, including for pain and suffering

18   and medical expenses.

19      140.   The Defendant acted with oppression, fraud, and malice towards

20   Plaintiff.

1    141.   Had Defendant not concealed this information, neither Plaintiff's nor

2   her health care providers would have consented to using the device in Plaintiff.

3

4                                    **PRAYER**

5        **WHEREFORE**, Plaintiff prays for judgment against each of the Defendant

6   as follows:

7            a.      Judgment be entered against all Defendant on all causes of action

8        of this Complaint;

9            b.      Plaintiff be awarded her full, fair, and complete recovery for all

10       claims and causes of action relevant to this action;

11           c.      Plaintiff be awarded general damages according to proof at the

12       time of trial;

13           d.      Plaintiff be awarded damages, including past, present, and future,

14       medical expenses according to proof at the time of trial;

15           e.      Awarding pre-judgment and post-judgment interest to the

16       Plaintiff;

17           f.      Awarding the costs and the expenses of this litigation to the

18       Plaintiff.

19           g.      For such other and further relief as the court may deem just and

20       proper.

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff hereby demands trial by jury on all issues.

3

4                                        Respectfully submitted,

5

6

7                                        /s/ Ruth Rizkalla

8    Dated:      November 12, 2025       Ruth Rizkalla #224973

9                                        **THE CARLSON LAW FIRM**

10                                       1500 Rosecrans Ave., Suite 500

11                                       Manhattan Beach, CA 90266

12                                       Tel: (800) 359-5690

13                                       Email: RRizkalla@carlsonattorneys.com

14

15

16                                       /s/ Aaron K. Dickey

17                                       Aaron K. Dickey #6281731 IL

18                                       **DICKEY ANDERSON LAW FIRM, LLC**

19                                       1104 Moorlands Drive, 2nd Floor

20                                       St. Louis, MO 63117

21                                       Tel: (314) 810-7668

22                                       Email: aaron@dickeyanderson.com

23

24                                       *Attorneys for Plaintiff*

25